<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| STEPHEN W. LEIBHOLZ, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO. 05-5148 (DRD) |
| ROBERT J. HARIRI | **<u>OPINION</u>** |
| Defendant. | |

REM ZELLER LAW GROUP
Robert Zeller, Esq.
25 East Sale Street, Suite 400
Hackensack, New Jersey 07601
    *Attorneys for Plaintiff*

LAW OFFICES OF ALAN L. ZEGAS
Alan L. Zegas, Esq.
552 Main Street
Chatham, New Jersey 07928
    *Attorneys for Defendant*

<u>DEBEVOISE, Senior District Judge</u>

### I.  PROCEDURAL HISTORY

The matter is now before the Court on plaintiff Stephen W. Leibholz's ("Lebholz's") motion to dismiss the counterclaims of defendant and counterclaimant, Robert J. Hariri ("Hariri") for failure to state a cliam upon which relief can be granted and on Hariri's motion for summary judgment on all of Leibholz's claims.

Leibholz filed his Complaint on October 27, 2005, alleging that Hariri committed

Securities Fraud, Fraud Under New Jersey Law, and Breach of Contract among other things[1].

An Amended Complaint was filed on November 10, 2005.  The eight counts of the Amended

Complaint are: (i) Securities Fraud–Oral Misrepresentations Made Without a Present Intent to

Perform; (ii) Securities Fraud–Written Misrepresentations Made Without a Present Intent to

Perform; (iii) Fraud Under New Jersey Law–Oral Misrepresentations Made Without a Present

Intent to Perform; (iv) Fraud Under New Jersey Law–Written Misrepresentations Made Without

a Present Intent to Perform; (v) Promissory and Equitable Estoppel; (vi) Breach of

Contract–Specific Performance; (vii) Breach of Contract–Money Damages; and (viii)

Constructive Trust.  On January 31, 2006, Hariri filed Counterclaims against Leibholz for (i)

Invasion of Privacy–Misappropriation of Name and Likeness; (ii) Invasion of Privacy–False

Light; and (iii) Fraudulent Advertising in violation of N.J.S.A. 56:8-2.  Leibholz filed this motion

to dismiss Hariri's counterclaims on March 2, 2006.  Hariri responded with a motion for

summary judgment, which was filed on April 10, 2006.  For the reasons set forth below,

Leibholz's motion to dismiss Count III of Hariri's counterclaims will be granted, but denied as to

Counts I and II.  In addition, Hariri's motion for summary judgment will be granted as to

Leibholz's First and Second and Fifth Causes of Action, but denied as to his Third, Fourth, Sixth,

Seventh and Eighth causes of action.  Hariri's motion for summary judgment on Leibholz's Fifth

Cause of Action will be granted in part and denied in part.

## II.  BACKGROUND

Defendant Hariri is a medical doctor and researcher who specializes in the areas of

---

[1]Leibholz also named Celgene Corporation ("Celgene") as an additional defendant for purposes of being
accorded complete relief; however, Leibholz voluntarily dismissed Celgene as a defendant.

neurosurgery, neurotrauma/critical care, cell biology and vascular pathology.  (Def.'s Cert. ¶ 2). Hariri formed LifeBank, Inc., which commenced active business operations in 1998, later changing its name to Arthrogenesis, Inc.  LifeBank harvested stem cells from umbilical cords and placentas and performed medical research regarding the medical uses of umbilical blood stem cells. (Def.'s Cert., ¶ 3).

Plaintiff Leibholz is a businessman and physicist with experience in U.S. defense contracting.  (Pl.'s Cert., Ex. A).  At the time Leibholz met Hariri, Leibholz was operating Chesapeake TechLabs, Inc., and was engaged in consulting services.

In 2000, Leibholz was introduced to Lifebank as an advisor to Mr. Richard Farkas, one of the prospective investors in Lifebank.  (Def.'s Cert., ¶ 5).  Thereafter, from early 2000 through September 2000, Leibholz periodically visited LifeBank and discussed management, marketing, technical matters with Hariri.  (Pl.'s Cert., ¶¶ 9-14).  Leibholz avers that he and Hariri worked together on a preliminary design for a transporter device for live stem cells, and Leibholz incorporated a non-profit entity, the Biomedical Research Institute, Inc. ("BRI"), at Hariri's request.  (Pl.'s Cert., ¶ 12).  According to Leibholz, the purpose of BRI was to perform research and development using LifeBank facilities and personnel, and to qualify LifeBank for certain government research grants.  Leibholz also certified that he and Hariri explored possible participation in government defense projects involving stem cells.  (Pl.'s Cert., ¶¶ 23-25).

Liebholz claims that "during one or more meetings in September of 2000," Hariri offered to give Leibholz LifeBank stocks and stock options from Hariri's personal holdings in exchange for Leibholz's services.  (Compl., ¶ 17).  Leibholz avers that he agreed to this arrangement, but that he requested that Hariri confirm in writing the number of shares and share options that Hariri

3

was proposing. (Compl., ¶ 18).  Liebholz alleges that he continued to perform services for Hariri in reliance of Hariri's oral promises.  (Pl.'s Cert.,  ¶ 14).

On September 29, 2000 Hariri wrote Leibholz a letter stating that Hariri wanted Leibholz to have an equity interest in LifeBank "as an incentive for further collaboration."  (Pl.'s Ex. B). In that letter, Hariri pledged to give Leibholz 20,000 shares of Hariri's stock in LifeBank and 20,000 warrants to purchase Lifebank common stock from Hariri's personal holding at $5.00 per share, exercisable through December 31, 2005.  Id.

Leibholz claims that during the twelve-month period following September 29, 2000 he made five visits to the LifeBank office and two trips to Oak Ridge, Tennessee, where he met with officials at the Oak Ridge National Laboratories ("REACT") and discussed a possible relationship with LifeBank.  (Pl.'s Cert., ¶ 19).  Further exploration of the REACT project was abandoned, however, when Hariri refused to participate.  (Pl.'s Cert., ¶ 25).  Although Leibholz met and spoke with Hairi during this time, they did not discuss Leibholz's compensation.  Pl.'s Cert. ¶ 19.

Sometime in 2004 LifeBank merged into Celgene, Inc., a major pharmaceutical and biotechnological company.   (Pl.'s Br. in Opp., at 3).  This prompted Leibholz, who had only kept in sporadic touch with Hariri after 2002, to review his documents.  Id.  On December 31, 2004, Leibholz sent a letter to Hariri demanding that Hariri honor the terms of his September 29, 2000 letter.  (Def.'s Br., at 7).  Hariri refused, claiming that LifeBank had gone out of business and that, in any event, the September 29, 2000 offer was retracted by his October 2, 2000 letter. (Pl.'s Cert., ¶ 17).  Leibholz and his secretary certified that Leibholz did not receive Hariri's October 2, 2000 letter.  (Pl.'s Cert., ¶ 29; Chirstensen Cert., ¶ 5).

4

Hariri paints a wholly different picture of Leibholz's involvement with LifeBank. According to Hariri, Leibholz continually represented that he had the ability to raise substantial funds for LifeBank.  (Def.'s Cert., ¶ 5).  Hariri admits that he engaged in preliminary discussions concerning a possible collaboration with Leibholz's company, TechLabs, to pursue government research grants.  Id.  Hariri claims that his September 29, 2000 letter merely outlined the draft terms of a possible business relationship with Leibholz's company, and that this proposal was retracted by a letter sent to Leibholz on the next business day.  (Def.'s Cert., ¶ 5).  The October 2, 2000 letter detailed a discussion Hariri had with John Haines, LifeBank's CEO, who advised Hariri against any business relationship with Leibholz.  (Def.'s Cert., ¶ 7).  Hariri and his staff certified that Hariri sent the October 2, 2000 letter to Leibholz on October 2, 2000 by first class mail.  (Nayfeld Cert., ¶ 3).

Hariri further denies having ever requested or received any services from Leibholz, as a consultant or otherwise, and characterizes Leibholz as someone "seeking to obtain a joint venture partner," whose overtures were repeatedly rejected by Hariri and LifeBank.  (Def.'s Cert., ¶ 8-10).  Hariri points out that Leibholz never had access to LifeBank's books, records or proprietary information, and that Leibholz produced no records in connection with the alleged "consulting services."  (Def.'s Cert., ¶ 10).  Hariri also avers that the only connection Libholz had with Hariri and LifeBank after October 2, 2000 was Leibholz's unauthorized representation to government entities that Leibholz had potential access to Lifebank's products and services.  (Def.'s Cert., ¶ 12).

### III.  FACTS AS ALLEGED IN THE COUNTERCLAIMS

In his counterclaims, Hariri alleges that Leibholz is the owner and proprietor of an entity

5

known as Gensor, Inc. ("Gensor"), which is billed on its website, www.gensor.com, as a

biochemical and nanotechnology company.  (Counterclaim, ¶ 1).  The Gensor website contains a

page which lists the people and resources involved with the company, and this listing includes

Hariri, who is identified as the Vice President and Chief Scientist.  (Counterclaim, ¶ 2).  Hariri is

specifically listed as follows:

> "**The VP Chief Scientist, Robert Hariri, MD, PhD**, is a
> biologist, neurosurgeon, and inventor with extensive scientific
> and entrepreneurial experience."

(Counterclaim, ¶ 3).  Gensor also has a picture of the laboratory of Lifebank, which is owned and

operated by Hariri and which is wholly unconnected with Gensor, labeled as "Bio Laboratory" on

its website.  (Counterclaim, ¶ 4).  Hariri is not the VP and Chief Scientist of Gensor, nor is he

associated with Gensor in any way.  (Counterclaim, ¶ 5).  Leibholz was aware at all relevant

times that the representations concerning the role of Hariri and his laboratory were false.

(Counterclaim, ¶ 5).

## IV. STANDARD OF REVIEW

Dismissal of a complaint pursuant to Rule 12(b)(6) is proper "only if it is clear that no

relief could be granted under any set of facts that could be proved consistent with the

allegations."  Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).  Allegations contained in the

Complaint will be accepted as true, Cruz v. Beto, 405 U.S. 319, 322 (1972), and Plaintiff shall be

"given the benefit of every favorable inference that can be drawn from those allegations."  Schrob

v. Catterson, 948 F.2d 1402, 1405 (3d Cir. 1991).  However, Plaintiff is required to make factual

allegations and cannot rely on conclusory recitations of law.  Pennsylvania ex rel. Zimmerman v.

Pepsico, Inc., 836 F.2d 173, 179 (3d Cir. 1988).

Summary judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party,"  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the nonmoving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting, Anderson, 477 U.S. at 255).  The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). But where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (U.S. 1986).

Where the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Idus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  A genuine issue for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at

trial, could be the basis for a jury finding in that party's favor." J.E. Mamiye & Sons, Inc. v.

Fidelity Bank, 813 F.2d 610, 618 (3d Cir. 1987) (Becker, J., concurring).  If the non-moving

party's evidence is merely colorable, or is not significantly probative, summary judgment may be

granted. See Bixler v. Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292 (3d Cir.

1993); Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 980-

91 (3d Cir. 1992).

## V.  DISCUSSION

### A.  Leibholz's Motion to Dismiss

######      1.  Count I: Invasion of Privacy–Misappropriation of Name and Likeness

Faber v. Condecor, Inc., 195 N.J. Super. 81 (App. Div. 1984) explains that "it is only

when the publicity is given for the purpose of appropriating to [another]'s benefit the commercial

or other values associated with the name or the likeness that the right of privacy is invaded."

Faber v. Condecor, Inc., 195 N.J. Super. 81 (App. Div. 1984) (quoting Restatement (Second) of

Torts, § 652C comment d (1977)).  Here, Hariri's name was listed on Gensor.com, Leibholz's

website, as VP and Chief Scientist.  Because Hariri alleges that Leibholz "misappropriated the

name and likeness of [Hariri] in order to exploit his credentials, expertise, and professional

reputation . . ." (Counterclaim ¶ 6), and that Leibholz "at all relevant times has known that these

representations concerning the role of [Hariri] and his laboratory were false," (Counterclaim ¶ 5),

the inclusion of Hariri's name and the picture of Hariri's lab on the website could be considered

appropriated by Liebholz to "advertise [his] product."  Faber, 195 N.J. Super. at 86, quoting

Palmer v. Schonhorn Enterprises, Inc., 96 N.J. Super. 72 (Ch. Div. 1967), and  "mainly for

purposes of trade, without a redeeming public interest, news, or historical value," Tellado v.

8

Time-Life Books, Inc., 643 F. Supp. 904, 910 (D.N.J. 1986). This conclusion is strengthened by the fact that the Gensor website contains a statement on its homepage inviting potential investors to contact Liebholz if they are "interested in participating is this exciting and rapidly-growing enterprise." (Def.'s Br., at 30).

Leibholz cannot rely on cases like Castro v. NYT Television, 370 N.J. Super. 282 (App. Div. 2004), and Stanley v. General Media Communications, Inc., 149 F. Supp.2d 701 (W.D. Ark. 2001), because those were cases in which the mere use of a person's likeness by a media defendant, without use of the likeness to encourage more viewership or sell more magazines, was held to be incidental and therefore not actionable.  Castro, 370 N.J. Super. at 297 (quoting Restatement (Second) of Torts § 652C comment d (1977)); Stanley, 149 F. Supp.2d at 706 (citations omitted).  Not every use of one's image or likeness by a magazine is considered a "commercial use," since otherwise almost any publication of a name or likeness would be misappropriation.  Use of names and likenesses by non-media parties are different.   Therefore, Leibholz's motion to dismiss Count I of Hariri's counterclaims will be denied.

### 2.  Count II: Invasion of Privacy–False Light

Both parties cite to Romaine v. Kallinger, 109 N.J. 292 (1988), which adopts the Invasion of Privacy–False Light provisions of the Restatement (Second) of Torts § 652E, which states that:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false

light in which the other would be placed.

Accepting all allegations in the complaint as true, Liebholz knowingly portrayed Hariri in a false light when he was listed on the Gensor website as the VP and Chief Scientist. The Restatement (Second) of Torts § 652E also requires that "the false light in which the other was placed would be highly offensive to a reasonable person."  Comment c to § 652E explains that "highly offensive to a reasonable person" means "when there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position. . ." The Counterclaim that Hariri's portrayal as someone employed by Gensor is "highly offensive to [Hariri]," and that Hariri, " has "concerns about the professional reputation" of Gensor.  (Counterclaim ¶ 12).  However, the Counterclaim fails to allege one of the elements of the tort: that the false light in which Dr. Hariri was placed "would be highly offensive to a reasonable person."  Restatement (Second) of Torts, §652E(a) (1977).  Count II is therefore defective.  However, because the claim as stated is otherwise sufficient, and because, as Hariri's brief correctly points out, Fed. R. Civ. P. 15(a) permits a party to amend the pleading to allege the missing element, Hariri's pleading will be deemed sufficient.

Although the Gensor website correctly listed Hariri's other credentials, being listed falsely as VP and Chief Scientist of a company which Hariri deemed of doubtful reputation could be highly offensive to a reasonable person.   While there is little case law on the subject, Restatement § 562E, Comment c, Illustration 9 shows that even non-defamatory and arguably complimentary falsehoods are actionable, and Illustration 4 shows that false or fraudulently induced endorsements are actionable.  Therefore, a false claim of commercial association, even though it lists an impressive job title and correctly recites qualifications, does fall within the

10

scope of the Invasion of Privacy-False Light cause of action.  Therefore, the Court will deny

Leibholz's motion to dismiss Hariri's invasion of privacy counterclaim (Count II).

###       3.  Count III: Fraudulent Advertising in violation of N.J.S.A. 56:8-2

The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq. ("CFA"), applies "in

connection with the sale or advertisement of any merchandise."  N.J.S.A. 56:8-1(c) defines

"merchandise" as "any objects, wares, goods, commodities, services or anything offered, directly

or indirectly to the public for sale."  Furthermore, "advertisement" is defined as "the attempt

directly or indirectly by publication, dissemination, solicitation, endorsement or circulation or in

any other way to induce directly or indirectly any person to enter or not enter into any obligation

or acquire any title or interest in any merchandise or to increase the consumption thereof or to

make any loan."  N.J.S.A. 56:8-1(a).  Gensor's website falls under the CFA as it advertises its

services and products and invites investment.  Accepting Hariri's allegations as true, Leibholz

knowingly misrepresented to the public in his advertising of the services of Gensor that Hariri

was affiliated and associated with the company and this had the capacity to mislead the public

concerning the services provided by Gensor.

The CFA requires a showing of ascertainable loss, however, to collect treble damages.

N.J.S.A. 56:8-19.  A private plaintiff bringing an action under the CFA must show a violation of

the Act as well as demonstrate that he suffered ascertainable loss as a result of the unlawful

conduct and a causal relationship between the unlawful practice and the ascertainable loss.  Gross

v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 303 N.J. Super. 336 (L. Div.

1997).  Hariri has failed to allege an ascertainable loss in his complaint, but has simply stated that

the misrepresentations on the Gensor website have substantially damaged his professional reputation and goodwill.  Hariri claims in his brief in support of his counterclaim that even if ascertainable loss is not alleged, he should still be able to recover reasonable attorney's fees and costs.  Hariri cites a case supporting this proposition, Jiries v. BP Oil, 294 N.J. Super. 225, 231 (L. Div. 1996).

Even if this is so, however, Hariri is not a "consumer" within the meaning of the Consumer Fraud Act.  The court in J & R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259, 1273 (3rd Cir. 1994), stated that the overriding purpose of the Act is to "protect the consumer in the context of the ordinary meaning of the term in the marketplace." See also Arc Networks, Inc. v. Gold Phone Card Co., Inc., 333 NJ. Super. 587, 590 (L. Div. 2000), "[The CFA] is limited to consumer transactions which are defined by both the status of the parties and the nature of the transaction itself."  Since Hariri did not engage in any transaction with Gensor, he cannot state a claim under the CFA.  See Medical Soc. of N.J v. AmeriHealth HMO, Inc., 376 NJ Super. 48, 57 (App. Div. 2005).  Accordingly, Leibholz's motion to dismiss Count III of Hariri's counterclaims will be granted.

## B.  Hariri's Motion for Summary Judgment

### 1.  Leibholz's Federal Securities Fraud Claims (First and Second Causes of Action)

In his first and second causes of action, Leibholz asserts that Hariri made verbal and written representations promising to compensate Leibholz in Lifebank stocks and stock options for his services.  Leibholz further alleges that Hariri made these representations without the present intent to perform, in violation of §10(b) of the Securities and Exchange Act of 1934, 15

U.S.C. §78(j) and Rule 10b-5 promulgated thereunder ("10b-5 claims").

Rule 10b-5 prohibits the use of fraudulent devices, including misleading or untrue statements of material fact, "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Although Congress has not specified a limitations period, the United States Supreme Court in Lamf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991), held that private actions under §10(b) must be filed "within one year after the discovery of the facts constituting the violation and within three years after such violation." Lamf, 501 U.S. 350, 364. The Lampf Court also held that the three-year limitation served as a statute of repose in lieu of equitable tolling. Id. at 363. Thus, a §10(b) action must be brought within the statute of repose, "regardless of when a plaintiff discovered or could have discovered he had a claim." Del Sontro v. Cendant Corp., 223 F. Supp. 2d 563, 570 (D.N.J. 2002). Subsequent to the Lampf decision, Congress enacted the Public Company Accounting Reform and Investor Protection Act of 2002 ("Sarbanes-Oxley"). Section 804 of Sarbanes-Oxley extended the limitations period for securities fraud claims under Rule 10b-5 to the earlier of "two years after discovery" and "five years after the violation." Lieberman v. Cambridge Partners, L.L.C., 432 F.3d 482, 487 (3d Cir. 2005). Further, Section 804 was made applicable to all federal securities fraud claims brought on or after July 30, 2002, but did not revive previously expired claims. Id.

Leibholz's 10b-5 claims must be dismissed as untimely. For the purpose of ascertaining the repose period, claims under Section 10(b) accrue "on the date that the allegedly false or misleading statement underlying the claims was made." In re Exxon Mobil Corp., 387 F. Supp. 2d 407, 421 (D.N.J. 2005). The limitations period based on "discovery" begins to run when the plaintiff has "inquiry notice" - that is, when the plaintiff "discovered or in the exercise of

13

reasonable diligence should have discovered the basis for [his] claim against the defendant." <u>Del Sontro</u>, 223 F. Supp. 2d at 571 (citations omitted).  Taking Leibholz's allegations as true, all material misrepresentations concerning the purported sale of Lifebank securities were made on or before September 29, 2000.  Thus, Leibholz's10b-5 claims should have been brought within five years of the September 29, 2000 letter, on or before September 29, 2005.

Nonetheless, Leibholz argues that his federal securities fraud claims did not accrue until December 31, 2005, when his stock options expired.  As mentioned, the repose period runs from the date the alleged misstatements were made, regardless of when the plaintiff discovers the defendant's wrongdoing.  Moreover, Hariri's September 29, 2000 letter and his subsequent conduct should have prompted Leibholz to investigate any possible wrongdoing by Hariri.  That letter stated that the stocks and warrants would the distributed to Leibholz "at the next annual meeting."  If the stocks and warrants constituted the only form of compensation for the services being rendered, a reasonable person would have inquired about the issuance of the stock certificates and warrants when the Hariri failed to delivered them as promised.  Thus, Leibholz also had inquiry notice concerning the alleged wrongdoing as of September 29, 2001, at the latest, and should have brought his 10b-5 claims on or before September 29, 2003[2].  Therefore, the accrual of Leibholz's 10b-5 claims did not depend on the expiration of the stock options.

Because Leibholz's federal securities claims were not brought within the statute of repose for such claims, Hariri's motion for summary judgment will be granted as to Leibholz's First and Second causes of action.

---

[2]If the "annual meeting" took place earlier than July 30, 2001, then Plaintiff should have brought his action prior to July 30, 2002, before running the pre-Sarbanes-Oxley one-year statute of limitations.

###### 2.  Leibholz's Fraud Claims under New Jersey Law (Third and Fourth Causes of Action)

In his Third and Fourth Causes of Action, Leibholz alleges that he was defrauded by Hariri because his oral and written representations to Leibholz in September, 2000, were "intentionally false when made and [Hariri] ... at no time had the intent to compensate [Leibholz] with stock and stock options."  (Compl., ¶ 66).  Leibholz asserts that Hariri's misrepresentations were "motivated by a desire to obtain the ongoing services of [Leibholz] without compensation or remuneration of any kind."  (Compl., ¶ 67).  Leibholz further avers that he reasonably and detrimentally relied upon Hariri's false representations that he would compensate Leibholz with LifeBank stocks and stock options, and was therefore fraudulently induced into providing valuable services to Hariri and LifeBank.  (Compl., ¶ 69).  As a result of Hariri's fraud, Leibholz claims that he suffered actual damages – i.e., the value of the LifeBank stock and stock options or their Celgene equivalent.  Accepting Leibholz's factual evidence as true and drawing all reasonable inferences to be glean from it in his favor, the Court finds that Leibholz has raised sufficient support for his fraud claims to prevent summary dismissal.

As a threshold matter, the Court finds that Leibholz has pled his common law fraud claims with requisite specificity.  Rule 9(b) of the Federal Rules of Civil Procedure  requires that all claims of "fraud or mistake, the circumstances constituting fraud or mistake" be pled with particularity.  Fed. R. Civ. P. 9(b).  However, Rule 9(b) also provides that "intent, knowledge, and other condition of mind of a person may be averred generally."  Id.  The purpose of the heightened pleading requirement for fraud is "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of

15

immoral and fraudulent behavior."  Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742

F.2d 786, 791 (3d Cir.1984).  This requirement can be satisfied by "pleading the 'date, place or

time' of the fraud, or through 'alternative means of injecting precision and some measure of

substantiation into their allegations of fraud.'"  Lum v. Bank of America, 361 F.3d 217, 224 (3d

Cir .2004) (quoting Seville Indus., 742 F.2d at 791).  In addition, plaintiffs must also "allege who

made a misrepresentation to whom and the general content of the misrepresentation." Lum, 361

F.3d at 224.

Leibholz has pled his fraud claims with sufficient specificity to avoid a dismissal under

Rule 9(b).  In his Complaint, Leibholz specifically describes the alleged fraud.  Leibholz avers

that during the meetings he had with Hariri in September 2000 at LifeBank facilities, Hariri

promised to give Leibholz LifeBank stocks and stock options in exchange for Liebholz's

services.  Hariri's September 29, 2000 letter to Leibholz provides further details of that

"misrepresentation."  Leibholz has also averred the fact of his reliance with reasonable detail--

such as continuing to provide various services for Hariri and LifeBank, including certain trips to

Oak Ridge, Tennessee, to market LifeBank's services to the Federal Government.  Because

Leibholz's averments placed Hariri under sufficient notice regarding the precise misconduct at

issue, Leibholz's common law fraud claims will not be dismissed for failure to plead with

particularity.   Moreover, viewed in the light most favorable to Leibholz, his factual allegations

may support a jury finding against Hariri for fraud under New Jersey law.  An action in fraud

requires a showing that the defendant made an intentionally false representation of past or present

fact, intending that the plaintiff rely thereon, and that the plaintiff did rely on the

misrepresentation to his detriment.  Jewish Ctr. v. Whale, 86 N.J. 619, 624 (1981).  Proof of

fraud must be shown by clear and convincing evidence. <u>Alexander v. CIGNA Corp.</u>, 991 F.

Supp. 427, 435 (D.N.J. 1998), <u>aff'd</u>, 172 F.3d 859 (3d Cir. 1998).  According to New Jersey law

as interpreted by federal courts in this district, "where a promise is given and the promisor knows

at the time of promising that he has no intention of fulfilling it, the promise will constitute a

misstatement of present fact and may support an allegation of fraud." <u>LoBosco v. Kure</u>

<u>Engineering, Ltd.</u>, 891 F. Supp. 1020, 1032 (D.N.J. 1995).  A promisor's  "intent not to perform"

may be gleaned from the circumstances, such as: "the recklessness or implausibility of the

statement in light of later events; showing that the promisor's intentions were dependent upon

contingencies known only to the promisor; or simply from evidence indicating that the promisor

would not or could not fulfill the promise." <u>Ocean Cape Hotel Corp. v. Masefield Corp.</u>, 63 N.J.

Super. 369, 381 (App. Div. 1960); <u>Brittingham v. Huyler's</u>, 118 N.J. Eq. 352 (Ch. 1935), <u>aff'd</u>

120 N.J. Eq. 198 (E &A 1936).  However, mere nonperformance does not prove a lack of intent

to perform. <u>Ocean Cape Hotel</u>, 63 N.J. Super. at 382.  And although as a general rule a breach of

contract may not be converted into a fraud claim for the simple fact of breach, New Jersey courts

have also recognized that where, as here, a party is alleged to have been fraudulently induced into

entering into a contract, that party may maintain allegations of fraud alongside the contract claim.

<u>See</u> <u>LoBosco</u>, 891 F. Supp. at 1033;  <u>First Valley Leasing, Inc. v. Goushy</u>, 795 F. Supp. 693

(D.N.J. 1992); <u>cf.</u> <u>Werner & Pfleiderer Corp. v. Gary Chem. Corp.</u>, 697 F. Supp. 808 (D.N.J.

1988) (where damages for fraud and breach of contract overlap, plaintiff may not pursue tort

damages in fraud; plaintiff's case was "essentially contractual in nature.").

     Considering the record in a light most favorable to Leibholz, Leibholz can establish the

legal elements of fraud.  Hariri orally pledged his personal shares and later confirmed this pledge

in writing without any prior consent of the board of directors or John Haines, LifeBank's Chief

Executive Officer.  Hariri explained to Leibholz that the shares were coming out of Hariri's

personal holdings to "avoid difficulties and permissions associated with issuance of corporate

treasury shares." (Compl., ¶ 17).  Second, although by October 2, 2000, John Haines had

admonished Hariri against a business venture with Leibholz, Hariri continued to allow Leibholz

to explore possible government projects on behalf of LifeBank[3]. Indeed, in 2001, Hariri received

follow up reports from Leibholz on his trip to Oak Ridge, Tennessee, but did not discuss

Leibholz's compensation.  Compare, Wharf (Holdings) Ltd. v. United International Holdings,

Inc., 532 U.S. 588 (2001) (finding "intent not to perform" based on defendant's continued

acceptance of plaintiff's performance and contemporaneous internal communications showing

contrary intent).   Third, Leibholz's December 31, 2004 demand was met by a series of

misrepresentations by Hariri – e.g., that LifeBank had gone out of business.  Finally, Hariri had

much trouble producing the original copy of the envelope in which the October 2, 2004 letter was

mailed, even though his secretary had testified she had seen the copy in Hariri's file.  When

viewed in a light most favorable to Leibholz, these facts and circumstances could lead a jury to

find that Harir intended, at the time he made the alleged promises to Leibholz, not to compensate

Leibholz for his work.

That the promise of compensation was made to induce Leibholz's reliance could also be

inferred from the facts and circumstances.  According to Leibholz's certification, Hariri orally

---

[3]Hariri contends that Leibholz's work had nothing to do with LifeBank but with Biomedical Research Institute ("BRI"), a non-profit entity that Leibholz incorporated to hold LifeBank's intellectual property and to bid on government research projects.  However, BRI was a paper company which had no existence apart from LifeBank.  Moreover, Leibholz incorporated BRI under Hariri's direction.

promised LifeBank shares in compensation for Leibholz's continued involvement in developing government project opportunities for LifeBank.  Such intent is also reflected in the September 29, 2000 letter, wherein Hariri stated: "I see providing you with a stake in LIFEBANK as an incentive for further collaboration."

In addition, Leibholz reasonably relied upon Hariri's representations and incurred damages in the form of labor and expenses.  Again, taking the record in Leibholz's favor, Hariri represented that the only means of compensation for Leibholz's services would be LifeBank stock and stock options because LifeBank had a cash flow problem.  Leibholz accepted the arrangement because it was not uncommon for start up companies to offer compensation in stocks; and Leibholz had no reason to doubt Hariri's explanation for compensating Leibholz with Hariri's personal holdings in LifeBank.  Therefore, a jury could conclude that Leibholz's reliance was reasonable under the circumstances.

Finally, relying on Hariri's promises, Leibholz refrained from seeking his customary consulting fees.  Moreover, in addition to providing general management, marketing and technical advice to Hariri, Leibholz incorporated a non-profit company and reviewed a preliminary design of a stem cell transportation device.  Leibholz also certified that he made at least five visits to Lifebank's facilities and that he twice traveled to Oak Ridge, Tennessee, during the twelve-month period following September 29, 2000, to promote LifeBank.  (Pl's Cert. ¶25).  Thus, Leibholz arguably incurred a detriment as a result of his reliance upon Hariri's misrepresentations.

Hariri argues that Leibholz's purported reliance was unreasonable in light of Hariri's

October 2, 2000 letter.  However, the receipt of the letter is an issue for trial because Leibholz denies receipt and points to circumstances which undermine Hariri's credibility on the issue. Although Hariri produced a copy of the letter and envelope in which the letter was sent, the copy of the envelope was "found" after much difficulty; the date stamp on the copy is illegible; and Hariri's failure to produce the original photocopy prevents Liebholz from verifying the date and authenticity of the copy.  Inasmuch as the authenticity of Hariri's October 2, 2000 letter remains a material issue of fact, Leibholz's receipt cannot be assumed for purposes of Hariri's motion for summary judgment.

In sum, Leibholz has raised sufficient facts from which a jury could find that Hariri made false promises intending Leibholz to rely, and that Leibholz reasonably relied upon those statements to his detriment.  Leibholz has also pled his fraud claims with particularity. Accordingly, summary judgement will be denied on Leibholz's common law fraud claims (Third and Fourth Causes of Action).

### 3.  Plaintiff's Promissory and Equitable Estoppel Claims (Count V)

a.  Promissory Estoppel

To make a successful claim of promissory estoppel a plaintiff must demonstrate: (1) a clear and definite promise by the promissor; (2) the promise must be made with the expectation that the promisee will rely thereon; (3) the promisee must in fact reasonably rely on the promise, and (4) detriment of a definite and substantial nature must be incurred in reliance on the promise. Pop's Cones v. Resorts Int'l Hotel, 307 N.J. Super. 461 (App. Div. 1998).  Moreover, the promissor is bound only by reliance that he does or should foresee, and enforcement must be

necessary to avoid injustice.  Id., at 473.

Here, Hariri claims that his September 29, 2000 letter was neither a promise or confirmation of a promise.  Hariri further avers that Leibholz provided no services for Hariri or LifeBank, and that, in any event, Hariri revoked the promise by his October 2, 2000 letter.  On the other hand, Leibholz denies ever receiving the October 2, 2000 letter and contends that he did perform various services for Hariri and LifeBank, which services he would not have rendered in the absence of Hariri's promise for LifeBank stocks and stock options.  In addition to providing general management, marketing and technical advice to Hariri, Leibhold certified that he incorporated a non-profit company and reviewed a preliminary design of a stem cell transportation device.  Leibholz also certified that he made at least five visits to Lifebank's facilities and that he twice traveled to Oak Ridge, Tennessee, during the twelve-month period following September 29, 2000.  (Pl's Cert. ¶25).

Although there is a genuine issue of fact with respect to the first three elements of promissory estoppel, Leibholz's continued "collaboration" with LifeBank does not amount to "definite and substantial" detriment under New Jersey law.  Leibholz does not claim that he incurred significant expenses in connection with his activities relating to LifeBank or  in anticipation of Harir's performance.  Nor does Leibholz claim that he was prevented from pursuing other lucrative opportunities because of his commitment to LifeBank.  See, e.g., Aircraft Inventory Corp. v. Falcon Jet Corp., 18 F. Supp. 2d 409 (D.N.J. 1998).  Inasmuch as Leibhoz merely seeks benefit of his alleged bargain, without having incurred any damages in reliance of Hariri's promises, a promissory estoppel theory is unavailing to Leibholz.  See,

generally, Pop's Cones, 307 N.J. Super. at 473.

      b.  Equitable Estoppel

A claim in equitable estoppel is akin to a claim in fraud.  Under an equitable estoppel theory, a plaintiff must establish that the defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that, in fact, plaintiff acted or changed his position to his detriment.  Knorr v. Smeal, 178 N.J. 169 (2003).

If the record is taken in Leibholz's favor, a jury could find that a claim for equitable estoppel exists.  Hariri allegedly made oral and written representations to that Leibholz would be compensated LifeBank stocks and stock options.  Those representations induced Leibholz to perform various services for Hariri and LifeBank, which services he would not have rendered in the absence of Hariri's promise for LifeBank stocks and stock options.  Hariri accepted Leibholz's services but failed to compensate him.  And although Hariri contends that his October 2, 2000 letter would make any reliance by Leibholz unreasonable, Lebholz has also raised sufficient facts to rebut the presumption that the letter was mailed.  Thus, the record, taken in a light most favorable to Leibholz, could support a claim of equitable estoppel.

In sum, Leibholz can support an equitable estoppel claim, but not a promissory estoppel claim.  Accordingly, summary judgment will be granted to the extent that Leibholz's Fifth Claim advances a promissory estoppel theory, but will denied to the extent that it seeks to establish an equitable estoppel claim.

**4.  Breach of Contract Claims (Sixth and Seventh Causes of Action)**

Summary judgment will be denied on Leibholz's breach of contract claims because a genuine issue of fact exists regarding the existence of a contract. To prevail on a breach of contract claim, a plaintiff must prove that a valid contract existed, defendant materially breached the contract, and plaintiff suffered damages as a result of the breach. Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 421 F.Supp. 2d 831, 834 (D.N.J. 2006). A valid contract arises from mutual assent, usually by way of offer and acceptance, supported by consideration. See Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992); Fletcher-Harlee Corp. 421 F.Supp. 2d at 834. In addition, for a contract to be enforceable, its terms must be sufficiently definite so that performance to be rendered by each party can be ascertained with reasonable certainty. Id. at 435.

Taking Leibholz's allegations and certifications as true, a jury could conclude that the parties entered into a valid agreement concerning Leibholz's consulting services. Hariri's September 29, 2000 letter refers to a "unique relationship" that the parties have developed and offers LifeBank stocks and stock options to Leibholz as an "incentive for further collaboration.[4]" This supports Leibholz's assertion that the parties already had reached an oral agreement whereby Hariri pledged a compensation package consisting of stocks and stock options, in exchange for Leibholz's ongoing provision of consulting services.

---

[4]The letter reads, in pertinent part:

As we have previously discussed, I have wanted to find a means for you to participate in LIFEBANK on an equity basis. In my mind the relationship we have developed is unique and should continue to be mutually rewarding for years to come. I see providing you with a stake in LIFEBANK as an incentive for further collaboration... Obviously, there can be additional future incentives ... to reflect ongoing contributions... I look forward to working with you in the future.

23

When the record is viewed in a light most favorable to Leibholz, the letter could also be construed as an offer by Hariri, inviting Leibholz's "further collaboration" in exchange for a "compensation package" consisting of LifeBank stocks and warrants.  If the letter can be deemed an offer by Hariri, there is also evidence that Leibholz accepted this offer by providing "further collaboration."  Indeed, Leibholz continued to explore government contract opportunities for Hariri and LifeBank and reported his findings to Hairi.  In the absence of a specified method of acceptance, Leibholz's continued provision of services could reasonably be deemed a valid manifestation of assent and furnishing consideration for the contract.  See Restatement (Second) Contracts § 54, Comment c.  ("Where no return commitment is involved, the only notification of acceptance called for is often that necessarily involved in performance by the offeree ... Performance itself both manifests assent [to the offer] and furnishes consideration.").

Although Hariri claims that he retracted his September 29, 2000 letter by a subsequent letter of October 2, 2000, a jury could find from the circumstances surrounding its production that this letter was never mailed to Leibholz.  Morever, even if the October 2, 2000 letter was mailed to Leibholz as Hariri claims, this would not "undo" an oral agreement the parties already reached prior to September 29, 2000.  Accordingly, Hariri cannot rely on the October 2, 2000 letter as a basis for repudiating the existence of a contract.

Finally, the Court finds that as a matter law, the purported contract is not so vague and indefinite that it cannot be enforced.  Although Hariri's September 29, 2000 letter does not explain the type of "collaboration" and "contribution" that was expected from Leibholz, a factfinder could reasonably infer the meaning of those terms from the parties' ongoing activities

at the time of the contract.  See Shebar v. Sanyo Business Systems Corp., 111 N.J. 276, 544

(1988) ("The circumstances surrounding the statements made to plaintiff were such that a

factfinder could infer the terms and conditions of an employment contract from plaintiff's

existing employment...").  Thus, the indefiniteness of "collaboration" and "contribution" will not

render the contract unenforceable for vagueness.

In sum, the Court cannot find as a matter of law that no enforceable agreement exists

here.  If Leibholz's version of the facts are believed, a jury could find that Hariri and Leibholz

entered into a valid contract.  If Leibholz can prove the existence of a valid contract, Hariri

would have breached the contract by refusing to perform.  Inasmuch as material issues of fact

exist as to the existence of a contract, oral or written, summary judgment on Leibholz's Sixth and

Seventh causes of action would not be appropriate.

### 5.  Plaintiff's Constructive Trust Claim (Eighth Cause of Action)

_____A constructive trust is a remedial device by which the "conscience of equity finds

expression," thereby preventing the retention of property where, under the circumstances, it

would be against good conscience to do so.  Stewart v. Harris Structural Steel Co., Inc., 198 N.J.

Super. 255 (App. Div. 1984).  As such, a constructive trust may be imposed where there is

wrongful conduct, such as fraud, or where the retention of property would result in unjust

enrichment.  Flanigan v. Munson, 175 N.J. 597, 608 (2003); D'Ippolito v. Castoro, 51 N.J. 584,

589 (1968).   Here, the imposition of constructive trust depends on a finding of fraud or breach of

contract.  Inasmuch as factual issues prevent summary judgment on Leibholz's fraud and breach

of contract claims, summary judgment on this issue is also inappropriate.

## IV.  CONCLUSION

For the reasons stated above, Leibholz's motion to dismiss Count III of Hariri's counterclaims will be granted and its motion to dismiss Counts I and II will be denied.  In addition, Hariri's motion for summary judgment will be granted as to Leibholz's First and Second and Fifth Causes of Action, but denied as to his Third, Fourth, Sixth, Seventh and Eighth causes of action.  Hariri's motion for summary judgment on Leibholz's Fifth Cause of Action will be granted to the extent that it alleges a promissory estoppel claim, but will denied to the extent that it seeks to establish an equitable estoppel claim.  The court will enter an order implementing this opinion.


 _/s/ Dickinson R. Debevoise_____
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated:        July 13, 2006_____

26