**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

STEPHEN W. LEIBHOLZ,

                Plaintiff,

v.

ROBERT H. HARIRI,

                Defendant.

Civ. No. 05-5148 (DRD)

**O P I N I O N**

*Appearances by:*

REM ZELLER LAW GROUP, P.C.
By: Robert Zeller, Esq.
    Carlos M. Recio, Esq.

    *Attorneys for Plaintiffs,*

NAGEL RICE, LLP
by: Bruce H. Nagel, Esq.
    Robert H. Solomon, Esq.
103 Eisenhower Parkway
Roseland, New Jersey 07068

    *Attorneys for Defendants.*

**DEBEVOISE, Senior District Judge**

    This matter arises out of an alleged contract between Defendant Robert Hariri and

Plaintiff Stephen Leibholz, whereby Dr. Hariri would give equity in his company, Lifebank, Inc.

("Lifebank"), to Mr. Leibholz in exchange for Mr. Leibholz's consulting services. According to

Mr. Leibholz, this contract is enshrined in a letter written by Dr. Hariri, dated September 29, 2000.  Mr. Leibholz contends that he performed consulting services for Dr. Hariri in accordance with the contract, but Dr. Hariri refused to transfer any equity to him.  Thus, on October 27, 2005, Mr. Leibholz filed a Complaint against Mr. Hariri alleging securities fraud, common law fraud, and breach of contract.  On November 10, 2005, Mr. Leibholz filed an Amended Complaint alleging two claims of securities fraud, two common law fraud claims, promissory and equitable estoppel, and breach of contract.  The Amended Complaint sought damages, a constructive trust, and specific performance.  On January 31, 2006, Dr. Hariri counterclaimed against Mr. Leibholz for misappropriation, false light, and fraudulent advertising in violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-2.

On March 2, 2006, Mr. Leibholz moved to dismiss Dr. Hariri's counterclaims.  In response, on April 10, 2006, Dr. Hariri moved for summary judgment on all of Mr. Leibholz's claims.  In an Opinion, dated July 13, 2006, the Court dismissed Dr. Hariri's claim for fraudulent advertising, but found that he had adequately stated as claims for misappropriation and false light.  The Court also dismissed Mr. Leibholz's claims for securities fraud and promissory estoppel, but found material disputes regarding his claims for common law fraud, equitable estoppel, and breach of contract.

On July 31, 2007, Mr. Leibholz filed a Second Amended Complaint in order to set forth a claim against Dr. Hariri under the New Jersey Racketeering Influenced and Corrupt Organizations ("RICO") Act, N.J.S.A. 2C:41-1, *et seq*.  That claim alleges a scheme where Hariri fraudulently promised Lifebank employees and consultants equity in the company in exchange for their services.  It further alleges that Dr. Hariri received Lifebank stock through a fraudulent valuation of laboratory equipment that he contributed to the company.

Dr. Hariri now moves for summary judgment against all of Mr. Leibholz's claims. Mr. Leibholz moves for summary judgment against Dr. Hariri's counterclaims. Mr. Leibholz also moves for summary judgment in favor of his breach of contract claims. For the reasons set forth below, Dr. Hariri's motion will be granted, and Mr. Leibholz's motion will be granted with respect to Dr. Hariri's counterclaims, but denied with respect his breach of contract claims.[1]

Mr. Leibholz's claims for breach of contract are dismissed because the terms of the September 29, 2000 letter are too indefinite to constitute an enforceable contract. Mr. Leibholz's common law fraud claims are dismissed because the language of the September 29, 2000 letter does not amount to a material misrepresentation of fact. Similarly, his equitable estoppel claim is dismissed because no reasonable juror could find that the language of the September 29, 2000 letter induced Mr. Leibholz to perform services for Dr. Hariri. In addition, Mr. Leibholz's claim under the New Jersey RICO Act is dismissed because the record provides no evidence that Dr. Hariri was engaged in racketeering activity.

Finally, Dr. Hariri's claim for misappropriation is dismissed because he failed to demonstrate damages, as is his claim for false light because it falls outside the one-year statute of limitations.

## I. BACKGROUND

Robert J. Hariri is a medical doctor and researcher specializing in neurosurgery, neurotrauma/critical care, cell biology, and vascular pathology. In 1996, Mr. Hariri formed

---

[1] The disposition of the parties' dispositive motions in this case renders moot Dr. Hariri's pending Motion to Compel Deposition of Carlos Recio, ECF No. 176, and Motion to Determine Proper Measure of Damages on Plaintiff's Claims for Breach of Contract, ECF No. 177.

LifeBank, Inc.,[2] ("Lifebank") a biotech company that harvests, stores, and researches potential uses for stem cells from umbilical cords and placentas.[3]

Stephen W. Leibholz is a businessman and physicist who has experience as a defense-contractor with the United States government. Mr. Leibholz operates Chesapeake TechLabs, Inc. ("Techlabs"), a defense-contracting company, and serves as a consultant to several other defense-related and technology companies.

## A.  Facts Regarding Mr. Leibholz's Initial Claims

In 2000, Lifebank was in dire straits financially, and Dr. Hariri was looking for ways to raise money and generate revenue for the company. Early that year, Mr. Leibholz was introduced to Dr. Hariri as an advisor to Richard Farkas, a prospective investor in Lifebank. Over the months that followed, Mr. Leibholz periodically visited Lifebank to discuss Techlabs' work in government funded defense-related technologies. Dr. Hariri was interested in working with Mr. Leibholz because he believed that Mr. Leibholz was well-connected and could help generate revenue for Lifebank. Thus, they engaged in discussions regarding three potential means of collaboration: (1) an exchange of equity between Lifebank and Techlabs; (2) the creation of a non-profit entity to attract federal funding; and (3) Mr. Liebholz playing a future role as a consultant to Lifebank.

Mr. Hariri and Mr. Leibholz orally discussed the possibility of Mr. Leibholz becoming a consultant for Lifebank in May 2000. However, they did not reach an agreement regarding the term, scope, or specific projects for which Mr. Leibholz would provide consulting services. In the summer of 2000, Mr. Liebholz and Leon J. Sokol, counsel for Lifebank, prepared and

---

[2] At an unknown later date, Lifebank changed its name to Anthrogenesis, Inc. ("Anthrogenesis").  This opinion will refer to both Lifebank and Anthrogenesis interchangeably.

[3] LifeBank commenced active business operations in 1998.

executed documents in order to incorporate and begin running a non-profit entity called the

Biomedical Research Institute ("BRI") whose purpose was to attract government research

funding.  Mr. Leibholz continued to work with Mr. Sokol and various Lifebank personnel

through 2002 in an effort to attract such funding.

Mr. Liebholz maintains that during one or more meetings in September of 2000, Dr.

Hariri formally offered him LifeBank stock and stock options from his personal holdings in

exchange for Mr. Leibholz's consulting services.  Mr. Leibholz further maintains that he

accepted Dr. Hariri's offer and requested that he confirm in writing the number of shares and

share options that would be transferred.  However, he admits that the parties again did not agree

to the specific nature, duration, and scope of consulting services.  Nonetheless, he contends that

he performed such services for Dr. Hariri and BRI through 2002 in reliance on this oral

agreement.

In a letter, dated September 29, 2000, Mr. Hariri wrote the following to Mr. Leibholz: [4]

> Dear Steve:
>
> As we have previously discussed, I have wanted to find a means for you to participate in LIFEBANK on an equity basis.  In my mind the relationship we have developed is unique and should continue to be mutually rewarding for years to come.  I see providing you with a stake in LIFEBANK as an incentive for further collaboration.
>
> Toward that end, I have come up with a package comprised of 20,000 shares of my personal stock which I pledge to distribute to you at the next annual meeting combined with 20,000 warrants to purchase common stock at $5.00/share, exercisable through December 31, 2005.  The most recent private placement was transacted in September of this year at $8.50/share.
>
> Obviously, there can be additional future incentives through stock options and warrants to reflect ongoing contributions.

(Amend. Compl., Ex. A.)[5]

---

[4] Dr. Hariri maintains that he stamped "draft" on his copy of the September 29, 2000 letter.  However, the version of that letter in the record does not reflect such a stamp.

In 2004, Lifebank merged with Celgene, Inc. ("Celgene"), a major pharmaceutical and biotech company. On December 31, 2004, after reading about the merger on the internet, Mr. Leibholz, who, after 2002, had largely been out of touch with Dr. Hariri, sent him a letter of congratulations and requested that he "take[] appropriate action" on the September 29, 2000 letter. (Amend. Compl., Ex. B.) On September 29, 2005, Mr. Leibholz sent a second letter to Dr. Hariri asking for 40,000 shares of Celgene stock as compensation for services rendered under the terms of the September 29, 2000 letter. (Amend. Compl., Ex. C.) Dr. Hariri refused to remit the shares.

On October 27, 2005, Mr. Leibholz filed a Complaint asserting causes of action for securities fraud, common law fraud, and breach of contract. On November 10, 2005, Mr. Leibholz filed an Amended Complaint alleging securities fraud, common law fraud, promissory and equitable estoppel, and breach of contract. The Amended Complaint sought damages, a constructive trust, and specific performance.

**B.  Facts Regarding Dr. Hariri's Counterclaims**

From 2000-2005, Dr. Hariri was listed on the website of Gensor, Inc. ("Gensor"), a biochemical and nanotechnology company owned by Mr. Leibholz, as its Vice President and Chief Scientist. Specifically, the Gensor website described Dr. Hariri in the following manner: "**The VP Chief Scientist, Robert Hariri, MD, PhD** is a biologist, neurosurgeon, and inventor with extensive scientific and entrepreneurial experience."[6] (Certification of Robert Solomon in

---

[5] The parties dispute whether Dr. Hariri withdrew the terms of this letter orally and/or through a follow up letter, dated October 2, 2000. However, the Court need not delve into the facts surrounding that dispute because, as discussed in Point IIB the terms of the September 29, 2000 letter are too indefinite to constitute an enforceable contract.

[6] The parties dispute whether Dr. Hariri consented to the listing of his name and background on the Gensor website. However, the Court need not address the facts surrounding this dispute because, as discussed in Points IIF and G, Dr. Hariri's counterclaims for

Opposition to Plaintiff's Motions for Summary Judgment with Regard to the Contract Claims and the Counterclaim, dated October 22, 2010 ("Solomon Opp'n Cert."), Ex. F.)  The Gensor website also displayed a picture of Lifebank's laboratory, labeled as "Bio Laboratory."  See (Id.)

Dr. Hariri first discovered his name associated with Mr. Leibholz on a website in 2000, however, he cannot recall whether the website was Gensor's or Techlabs'.[7]  In October 2005, after the commencement of this litigation, Dr. Hariri accessed the Gensor website and noticed his listing there.  As a result, On January 31, 2006, Dr. Hariri asserted counterclaims against Mr. Leibholz for misappropriation, false light, and fraudulent advertising under the NJCFA.  The Gensor website was taken down shortly thereafter.

**C.  Prior Rulings on July 13, 2006**

On March 2, 2006, Mr. Leibholz moved to dismiss Dr. Hariri's counterclaims.  In response, on April 10, 2006, Dr. Hariri moved for summary judgment against all of Mr. Leibholz's claims.  In an Opinion, dated July 13, 2006, the Court dismissed Dr. Hariri's claim for fraudulent advertising, but allowed those for invasion of privacy to proceed.  In addition, the Court dismissed Mr. Leibholz's claims for securities fraud and promissory estoppel, but allowed his claims for common law fraud, equitable estoppel, and breach of contract to go forward.

In doing so, the Court found that Dr. Hariri had alleged sufficient facts to show that (1) Mr. Leibholz had misappropriate his name and likeness on the Gensor website to promote the reputation of the company and attract investors, and (2) listing Dr. Hariri as VP and Chief

---

misappropriation and false light will be resolved on the issues of damages and the applicable statute of limitations, respectively.

[7] He also cannot recall whether he asked to be removed from either website.

Scientist at Gensor could be highly offensive to a reasonable person.[8]  However, the Court found that Dr. Hariri failed to state a claim for fraudulent advertising under the NJCFA because he did not engage in a consumer transaction with Gensor.

In addition, the Court found that Mr. Leibholz's securities fraud claims were untimely. However, with respect to his common law fraud claims, it found that Mr. Leibholz certified to sufficient facts to withstand dismissal under Federal Rule of Civil Procedure 9(b), namely that (1) In September 2000, Dr. Hariri promised him Lifebank stock and stock options in exchange for consulting services; (2) the September 29, 2000 letter is further evidence of this promise; (3) Mr. Leibholz relied on Dr. Hariri's promises by providing various services for Dr. Hariri and Lifebank, such as making trips to Oak Ridge Tennessee to market Lifebank's services to the federal government.

In addition, the Court noted that the record provided sufficient evidence to create a material dispute as to whether Dr. Hariri, at the time he made the alleged promises to Mr. Leibholz, intended to compensate him for his work.  Specifically, it pointed to the fact that (1) "Dr. Hariri orally pledged his personal shares and later confirmed this pledge in writing without any prior consent of the board of directors or John Haines . . . [and] Hariri explained to Leibholz that the shares were coming out of Hariri's personal holdings to avoid difficulties and permissions associated with issuance of corporate treasury shares" (Opinion, July 13, 2006, 18 ECF No. 35) (quotations and citations omitted); (2) "Hariri continued to allow Leibholz to explore possible government projects on behalf of LifeBank" even after John Haines admonished

---

[8] In fact, the Court found that Dr. Hariri's claim for false light was defective because it alleged that his portrayal on the Gensor website was highly offensive to him, rather than to a reasonable person.  However, it deemed that claim sufficient and allowed him to amend the pleadings pursuant to Federal Rule of Civil Procedure 15(a).  Dr. Hariri never amended this claim, which alone is a basis for its dismissal.

him against having any business relations with Mr. Leibholz (Id.); and (3) "Leibholz's December 31, 2004 demand was met by a series of misrepresentations by Hariri." (Id.)

The Court further found that "Leibholz's reliance could also be inferred from the facts and circumstances," namely that Dr. Hariri promised shares in Lifebank for Mr. Leibholz's "continued involvement in developing governmental project opportunities for LifeBank," and the language of the September 29, 2000 letter stating that Dr. Hariri saw "providing [Mr. Leibholz] with a stake in LIFEBANK as an incentive for further collaboration." (Id. at 18-19.) The Court found additional evidence of reasonable reliance from Dr. Hariri's representations to Mr. Leibholz that "the only means of compensation for Leibholz's services would be LifeBank stock and stock options because LifeBank had a cash flow problem . . . [and that] it was not uncommon for startup companies to offer compensation in stocks." (Id. at 19.)

With respect to Mr. Leibholz's claims for promissory estoppel, the Court found that Mr. Leibholz was unable to show a "definite and substantial detriment under New Jersey law." (Id. at 21.) However, it found the same evidence that supported Mr. Leibholz's fraud claim allowed his equitable estoppel claim to survive summary judgment.

With respect to Mr. Leibholz's breach of contract claims, the Court found that there was a material dispute as to the existence of a contract between Mr. Leibholz and Dr. Hariri. The Court found that a reasonable jury could conclude that the language of the September 29, 2000 indicates either a valid contract between the parties, or merely an offer. In the case of an offer, the Court noted that a reasonable jury could conclude that Mr. Leibholz accepted Dr. Hariri's offer and provided consideration by "continu[ing] to explore government contract opportunities for Hariri and LifeBank and report[ing] his findings to Hariri." (Id. at 24.)

Finally, the Court rejected Dr. Hariri's argument that the language of the September 29, 2000 letter is too vague and indefinite to be enforced. The Court found that while the letter "does not explain the type of 'collaboration' and 'contribution' that was expected from Leibholz, a factfinder could reasonably infer the meaning of those terms from the parties' ongoing activities at the time of the contract." (Id. at 24-25.)

## D.  Leibholz's New Jersey RICO Claim

On July 31, 2007, Mr. Leibholz filed a Second Amended Complaint ("SAC") in which he added a claim against Dr. Hariri under the New Jersey RICO statute for which he seeks punitive damages. That claim alleges a scheme where Dr. Hariri fraudulently promised Lifebank employees and consultants equity in the company in exchange for their services. Specifically, Mr. Leibholz alleges that from 1998 through 2007, "Hariri executed a scheme to obtain and/or retain for himself the stock promised to Laurence Stein, David Flynn, Alyssa Schneider, Karen Stockl, Steve Horvack, Susan Mitchell, Thomas Carscadden, Loulla Moshen, and Stephen Leibholz, and use that stock to build his own stock holdings in Lifebank and to use those stock holdings in Lifebank and to use those stock holdings to invest in Celgene." (SAC ¶ 126.) To do so, "Hariri misrepresented to . . . [those parties] that if each of them provided services to Lifebank at reduced or no current compensation, that Lifebank directly, or Hariri out of his own holdings, would issue Lifebank stock and, in the case of Mr. Leibholz, options for stock to each of them." (Id. ¶ 127.) Mr. Leibholz further alleges that "Hariri falsely represented to all of the shareholders of Lifebank . . . that he had contributed valuable equipment to Lifebank which justified his acquisition of thousands of shares of Lifebank stock." (Id. ¶ 125e.)

These allegations are strikingly similar to those set forth by Lawrence J. Stein in a Third Amended Complaint filed on January 5, 2007 in the Superior Court of New Jersey, Somerset

County, No. SOM-L-425-03 (the "Stein Lawsuit").  See (Certification of Robert Solomon in

Support of Motion for Partial Summary Judgment, dated September 27, 2010 ("Solomon Cert.

Supp."), Ex. F ¶ 106-107.)  In fact, the entire basis on which this Court granted Mr. Leibholz

leave to add his New Jersey RICO claim were the Superior Court's decisions allowing Mr.

Stein's New Jersey RICO claim to proceed in the Stein Lawsuit.[9]  See (id., Ex. H.)

In 2010, Dr. Hariri and Celgene moved for summary judgment against Mr. Stein's New

Jersey RICO claim in the Stein Lawsuit, which was granted by the Superior Court on April 19,

2010.  In doing so, it found that the record did not support a pattern of racketeeting activity,

because "the alleged predicate acts . . . were discrete and isolated incidents."  (Id., Ex. A.)  As a

result, the Court held that "the facts alleged by plaintiff do not establish relatedness . . . and

therefore cannot qualify as a 'pattern' under the express terms of the statute."  (Id.) (citing

N.J.S.A. 2C: 41-1d(2)).

## II.  DISCUSSION

Mr. Leibholz now moves for summary judgment in favor his breach of contract claims.

In doing so, he argues that the September 29, 2000 letter constitutes a valid, binding contract.

Dr. Hariri moves for summary judgment against those same claims, arguing that the letter was

not a contract, but rather a proposal to engage in further discussions.

Mr. Leibholz also moves for summary judgment against Dr. Hariri's counterclaims for

misappropriation and false light.  With respect to misappropriation, Mr. Leibholz argues that (1)

Dr. Hariri consented to the use of his name and background; (2) any misappropriation of Dr.

Hariri's name and background was incidental and therefore not actionable; and (3) Dr. Hariri

---

[9] In 2008, Mr. Stein moved for leave to file a Fourth Amended Complaint removing all
allegations regarding Loulla Moshen, David Flynn, Karen Stockl, Susan Mitchell, Alyssa
Snyder, and Steve Horvack, and add New Jersey RICO allegations regarding John O'Connor and
Donald Wernsing.  See (Solomon Cert. Supp., Ex. I.)  However, that motion was denied.  (Id.,
Ex. A.)

suffered no damages.  Dr. Hariri counters that (1) he only discovered his name on the Gensor website in October 2005; (2) the use of his name on the Gensor website was clearly intended to solicit business for the company; and (3) he suffered damages because he lost business for Lifebank as a result of his apparent association with Gensor.

With respect to false light, Mr. Leibholz argues that (1) the information listed on the Gensor website about Dr. Hariri was true; (2) the depiction of Dr. Hariri on Gensor's website was not highly offensive to a reasonable person; (3) Mr. Leibholz had no knowledge that the depiction of Dr. Hariri on the Gensor website was false; and (4) the claim is barred by the statute of limitations.  Dr. Hariri argues that his listing on the Gensor website was untrue and highly offensive to a reasonable person in Dr. Hariri's position because the listing falsely portrayed him as being associated with Gensor, which "gives the appearance that Dr. Hariri has in fact not been singularly focused on the development of Lifebank, contrary to the expectations of his investors."  (Def.'s Br. Summ. J. 38.)  He further argues that his claim is not barred by the statute of limitations because he first discovered that he was listed on the Gensor website in October 2005.

Finally, Dr. Hariri moves for summary judgment against Mr. Leibholz's common law fraud, equitable estoppel, and New Jersey RICO claims.  With respect to common law fraud and equitable estoppel, Dr. Hariri argues that because the current record shows that neither Mr. Leibholz nor Mr. Hariri believed that they had entered into any agreement before September 29, 2000, "it is not possible for Dr. Hariri to have made promises that he had no intention to keep." (Def.'s Br. Summ. J. 36.)  He further argues that "without such promises or an agreement, Leibholz cannot establish by clear and convincing evidence that he was induced to do anything as a result of Dr. Hariri's actions."  (Id. at 37.)  Mr. Leibholz counters that the Court's July 13,

12

2006 finding of a material dispute regarding his fraud claims should be upheld based on the law of the case doctrine.

Dr. Hariri argues that he is entitled to summary judgment against Mr. Leibholz's New Jersey RICO claim because (1) the decision to dismiss Mr. Stein's counterpart RICO claim in the Stein Lawsuit is highly persuasive, and (2) there is no evidence in the record of an enterprise or a pattern of racketeering activity. Mr. Leibholz argues that Lifebank constitutes an enterprise because "Dr. Hariri, aided and abetted by other Lifebank representatives such as Mr. Haines and Mr. Sokol . . . used Lifebank to conduct fraudulent activities" in the form of "reneging on this commitments to issue stock and stock options used to entice other persons to work with and for . . . Lifebank . . . for his own benefit as well as the legitimate business of Lifebank." (Pl.'s Br. Summ. J. 7.) Mr. Leibholz further argues that the instances where Dr. Hariri reneged on alleged promises of equity to Lifebank employees and consultants in exchange for services constitutes a pattern of racketeering activity.

**A. Standard of Review**

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude granting summary judgment.

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the

moving party does not bear the burden of proof at trial, it may discharge its burden under the

summary judgment standard by showing that there is an absence of evidence to support the non-

moving party's case.  Id. at 325.  If the moving party can make such a showing, then the burden

shifts to the non-moving party to present evidence that a genuine factual dispute exists and a trial

is necessary.  Id. at 324.  In meeting its burden, the non-moving party must offer specific facts

that establish a material dispute, not simply create "some metaphysical doubt as to the material

facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding whether a dispute of material fact exists, the Court must consider all facts and their

reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v.

Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the

evidence and rule on the truth of the matter, but rather to determine whether there is a genuine

issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues

that require a trial, then judgment as a matter of law is appropriate.  Id. at 251-52.

**B.  Mr. Leibholz's Breach of Contract Claims**

Mr. Leibholz argues that he is entitled to summary judgment in favor of his breach of

contract claims because the language of the September 29, 2000 letter and the circumstances

surrounding that letter indicates Dr. Hariri's clear intent to give Mr. Leibholz 20,000 of his

personal shares of Lifebank stock, as well as options to purchase 20,000 shares of Lifebank

common stock at $5 per share by December 5, 2005 in exchange for various services to help

Lifebank attract investors and generate revenue.  On that basis, Mr. Leibholz contends that the

September 29, 2000 letter constitutes a binding contract that Dr. Hariri breached when he refused

to transfer 40,000 shares of Lifebank (now Celgene) stock to him.  Dr. Hariri maintains that

summary judgment should be granted against Mr. Leibholz's breach of contract claims because

the September 29, 2000 letter does not constitute a contract, but rather an invitation to engage in further discussion.[10]

"A contract arises from offer and acceptance, and must be sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty." Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992); see also Gamble v. Connolly, 399 N.J. Super. 130, 140-41 (Law Div. 2007) ("[T]he terms of a contract must be definite and certain so that a court may order with precision what the parties must do."). Here, the September 29, 2000 letter specifically describes the performance to be rendered by Dr. Hariri—distributing 20,000 shares of his personal stock at Lifebank's 2001 annual shareholders meeting, along with 20,000 warrants to purchase Lifebank common stock at $5.00 per share—but leaves the terms of Mr. Leibholz's performance to speculation. Indeed, the nature and scope of Mr. Leibholz's "further collaboration" with Dr. Hariri as consideration for Lifebank equity remain wholly unclear.[11] Therefore, determining whether Mr. Leibholz performed under the terms of the September 29, 2000 letter would be a fool's errand.

---

[10] Dr. Hariri argues that, in the alternative, to the extent that the September 29, 2000 letter was a formal offer to be accepted, that offer was withdrawn by his alleged follow up letter of October 2, 2000. The Court need not reach potential issues of offer, acceptance, and revocation, because, as discussed fully below, any alleged agreement between the parties regarding the transfer of shares in Lifebank in exchange for Mr. Leibholz's services is too indefinite to be enforceable.

[11] Mr. Leibholz maintains that "to the extent that there is ambiguity . . . there exist issues for trial." (Pl.'s Br. Opp. Summ. J. 38.) It is important to distinguish the term "indefinite" from "ambiguous." As discussed previously, a contract is indefinite as a matter of law if the obligations of each party to it cannot "be ascertained with reasonable certainty." Weichert Co., 128 N.J. at 435. In contrast, a contract is ambiguous if one or more of its terms is subject to more than one reasonable interpretation. Nester v. O'Donnell, 301 N.J. Super, 198, 210 (App. Div. 1997). In such cases, the ambiguous provisions should be left to a jury. Driscoll Const. Co., Inc. v. State Dept. of Transportation, 371 N.J. Super. 304, 313 (App. Div. 2004). Here, the term "further collaboration" is not subject to more than one reasonable interpretation; rather it has no reasonable interpretation in the first place. Therefore, the meaning of that term should not be determined by a jury.

To be sure, in its July 13, 2006 ruling, the Court found a material dispute regarding whether the September 29, 2000 letter amounted to a contract.  However, this finding was based on the alleged prior oral agreement of September 2000 between Mr. Leibholz and Dr. Hariri that the September 29, 2000 letter could have been intended to memorialize.  With the benefit of further discovery, the record is now clear that although the parties engaged in oral discussions, neither Dr. Hariri nor Mr. Leibholz believed that they reached a formal agreement prior to the September 29, 2000 letter.[12]  See (Solomon Cert. Supp., Ex. D at Tr. 91:11-92:2, Tr. 19:25 to 20:21, Tr. 92:2, Tr. 19:25 to 20:21.)  Thus, at best, the September 29, 2000 letter is an invitation to Mr. Leibholz to engage in further discussions regarding the nature, duration, and scope of collaboration between the parties in exchange for equity in Lifebank.  As a result, Mr. Leibholz's claims for breach of contract are dismissed.

**C.  Mr. Leibholz's Claims for Common Law Fraud**

The absence of a definite agreement prior to the September 29, 2000 letter also eliminates any material dispute regarding to Mr. Leibholz's common law fraud claims.  In New Jersey, common law fraud has five elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997).

In its July 13, 2006 ruling, the Court refused to grant summary judgment against Mr. Leibholz's common law fraud claims due, in large part, to the factual question of whether Dr.

---

[12] Mr. Leibholz maintains that "he had a general oral understanding" with Dr. Hariri regarding a transfer of Lifebank share in exchange for consulting services.  (Pl.'s Reply Br. Summ. J. 1.)  However, he admits that he and Dr. Hariri failed to reach an agreement regarding essential terms such as compensation for and the scope and duration of such services.  (Solomon Cert. Supp., Ex. D at Tr. 19:25-20:21.)  Thus, even if the parties had entered into some sort of prior oral agreement, the terms of such an agreement remain indefinite and therefore unenforceable.  See Weichert Co., 128 N.J. at 435.

Hariri and Mr. Leibholz entered into an oral agreement that was confirmed by the September 29, 2000 letter.  On the basis of that factual question, the Court held that a reasonable juror could find that (1) Dr. Hariri made a material misrepresentation of fact in the form of promising Mr. Leibholz shares in Lifebank in exchange for his services without ever intending to transfer them; (2) Dr. Hariri knew that he never intended to transfer shares in Lifebank to Mr. Leibholz because he allegedly misrepresented that Lifebank had gone out of business; (3) Dr. Hariri nonetheless intended for Mr. Mr. Leibholz to rely on the promise of shares in Lifebank by continuing to allow Mr. Leibholz to continue performing services for him and the company; (4) Mr. Leibholz reasonably relied on Dr. Hariri's promise of Lifebank equity in performing services for him and the company; and (5) incurred damages in the form of labor and expenses.

Under the law of the case doctrine, a court will generally not reconsider questions previously ruled upon in the same case.  In re City of Philadelphia Litig., 158 F.3d 711, 717 (3d Cir. 1998).  "The doctrine is designed to protect traditional ideals such as finality, judicial economy and jurisprudential integrity."  Id. at 717-18.  However, "it does not restrict a court's power but rather governs its exercise of discretion.  Id. at 718.  Therefore, "the doctrine does not preclude [] reconsideration of previously decided issues in extraordinary circumstances such as where: (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice."  Id.

Here, the benefit of additional discovery since the Court's July 13, 2006 ruling changes the outcome of Mr. Leibholz's fraud claims.  As discussed in Point IIB regarding Mr. Leibholz's claims for breach of contract, Mr. Leibholz now admits that he never had an agreement with Dr. Hariri to perform consulting services in exchange Lifebank equity prior to September 29, 2000.

Furthermore, he admits that there was no agreement regarding the specific nature, duration and scope of his services.

Therefore, absent a prior agreement, there is no evidence that Dr. Hariri made a material misrepresentation of fact to Mr. Leibholz regarding an exchange of shares in Lifebank for Mr. Leibholz's services.  The September 29, 2000 letter states that (1) Dr. Hariri "ha[s] wanted to find a means for [Mr. Leibholz] to participate in LIFEBANK on an equity basis"; (2) "[i]n [his] mind the relationship [they] have developed is unique and should continue to be mutually rewarding for years to come"; and (3) he see[s] providing [Mr. Leibholz] with a stake in LIFEBANK as an incentive for further collaboration." (Amend. Compl., Ex. A.)  These are not statements of fact, but rather those of opinion that cannot support a fraud claim.  See Manasquan River Reg. Sewerage v. Ocean County Utilities Authority, 117 N.J. 238, 248 (1989) ("An assertion is one of opinion if it expresses only a belief, without certainty, as to the existence of a fact or expresses only a judgment as to quality, value authenticity, or similar matters.") (internal citations omitted).

Nor is there any evidence that Dr. Hariri misrepresented his future intentions in the September 29, 2000 letter.  New Jersey courts "have held representations of future intentions to be actionable if the declarant knew at the time the representation was made that it could not be performed."  Id.  Such knowledge may be inferred "from the utter recklessness and implausibility of the statement in light of subsequent acts and events; from a showing that at the time of the making of the promise, the promisor's intention to perform was dependent upon contingencies known to the promisor and known to the promise; or from circumstances indicating that the promisor must have known at the time of his promise that he could not or would not fulfill it."  Id. (citation omitted)

In its July 13, 2006 ruling, the Court found a material dispute about whether Dr. Hariri misrepresented his future intention to transfer shares in Lifebank to Mr. Leibholz based on the factual question of whether Dr. Hariri entered into an oral agreement to do so that was later confirmed in the September 29, 2000 letter "without prior consent of the board of directors or John Haines."  (Opinion, 18, July 13, 2006, ECF. No. 35.)  However, as discussed in Point IIB, now that the record is clear that the parties did not enter into a prior agreement, the September 29, 2000 letter is, at best, an invitation to Mr. Leibholz to engage in future discussions about the specific nature, scope, and duration of Mr. Leibholz's services.  Therefore, no reasonable juror could find that Dr. Hariri misrepresented a future intention to transfer shares in Lifebank to Mr. Leibholz because the parties had not even reached an agreement regarding the consideration for those shares.[13]

**D.  Mr. Leibholz's Claim for Equitable Estoppel**

Similarly, the absence of a prior oral agreement eliminates any material dispute regarding Mr. Leibholz's claim for equitable estoppel.  To establish equitable estoppel, a plaintiff must show that a defendant "engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiffs acted or changed their position to their detriment."  Knorr v. Smeal, 178 N.J. 169, 178 (2003).  In its July 13, 2006 ruling, as with Mr. Leibholz's common law fraud and breach of contract claims, the Court found a material dispute regarding Mr. Leibholz's claim for equitable estoppel based on the factual question of whether the parties entered into an agreement prior to the September 29, 2000 letter.  However, now that the record shows that the parties did not reach any such agreement, no reasonable juror could find that the

---

[13] Furthermore, the nature of the September 29, 2000 letter was an invitation to engage in further discussions eliminates any material dispute regarding whether Mr. Leibholz reasonably relied on its language in performing services for Dr. Hariri.

language of the September 29, 2000 letter would induce Mr. Leibholz to perform services for Dr. Hariri and Lifebank, as that letter was merely an invitation to engage in discussions regarding the duration and scope of such services.

**E.  Imposition of a Constructive Trust**

Dr. Hariri correctly argues that if the Court no longer finds a material dispute with respect to Mr. Leibholz's breach of contract and common law fraud claims, the imposition of a constructive trust would be inappropriate in this case.  A constructive trust is a remedial device imposed "[w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain."  Flanigan v. Munson, 175 N.J. 597, 608 (2003).  New Jersey courts apply a two-pronged test when determining whether a constructive trust is appropriate in a given case.  "First, a court must find that a party has committed a wrongful act." Id. (internal quotations and citations omitted).  "Second the wrongful act must result in a transfer or diversion of property that unjustly enriches the recipient."  Id.

In its July 13, 2006 ruling, the Court found that denying Mr. Leibholz's request to impose a constructive trust was inappropriate because there were material disputes regarding his breach of contract and fraud claims, which, in turn, led to a material dispute regarding whether Dr. Hariri committed a wrongful act.  However, as discussed in Points IIB and C, there are no longer material disputes with respect to those claims.  Therefore, the imposition of a constructive trust is no longer appropriate.

**F.  Dr. Hariri's Counterclaim for Misappropriation of Name and Likeness**

Dr. Hariri's counterclaim that Mr. Leibholz misappropriated his name or likeness fails because he has failed to demonstrate damages.  "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his [or her]

privacy."  Restatement (Second) of Torts § 652C.  Accordingly, to establish a prima facie case for

invasion of privacy by appropriation of likeness, a plaintiff must establish that (1) the defendant

appropriated the plaintiff's likeness, (2) without the plaintiff's consent, (3) for the defendant's

use or benefit, and (4) damages.  See Faber v. Condecor, Inc., 195 N.J.Super. 81, 86-90,

(App.Div.), certif. denied, 99 N.J. 178 (1984).

      A party that establishes a cause of action for misappropriation and other privacy torts

may recover damages for "(a) the harm to his interest in privacy resulting from the invasion; (b)

his mental distress proved to have been suffered if it is of a kind that normally results from such

an invasion; and (c) special damage of which the invasion is a legal cause."  Restatement

(Second) of Torts Section 652H; see also Faber, 195 N.J. at 90.  Dr. Hariri alleges that he

suffered damages because "[o]ne company refused to do business with [him] because they said

that [he] had involvement with some individuals formally in a company that they did not want to

be involved with," which, according to him, *may* have been the result of being listed on the

Gensor website.  (Def.'s Br. Summ. J. 35.)  This allegation is far too speculative to state a

cognizable harm resulting from Dr. Hariri's listing on the Gensor website.  Accordingly, Dr.

Hariri's claim for misappropriation is dismissed.

## G.  Dr. Hariri's Counterclaim for False Light

      The Court need not reach the merits of Dr. Hariri's false light claim because it is barred

by the statute of limitations.  The statute of limitations applicable to false light and defamation

claims in New Jersey is provided by N.J.S.A. 2A:14-3, which states that "[e]very action at law

for libel or slander shall be commenced within 1 year next after the publication of the alleged

libel or slander."  R.K. v. Y.A.L.E. Schools, Inc., 621 F. Supp. 2d 188, 202 (D.N.J. 2008) (citing

Rumbauskas v. Cantor, 138 N.J. 173, 183 (1994)).  It is undisputed that Dr. Hariri's name and

information was first listed on Gensor's website in 2000.  Accordingly, because Dr. Hariri

brought his false light claim against Mr. Leibholz on April 10, 2006—six years after his listing

was published on Gensor's website—that claim is dismissed.  Dr. Hariri's allegation that he only

discovered his name on that site in October 2005 is inapposite.

### H.  Mr. Leibholz's New Jersey RICO Claim

The New Jersey RICO statute is intended to protect against "organized crime activity."

State v. Ball, 141 N.J. 142, 157 (1995) (citing N.J.S.A. 2C:41-1.1c).  "The gravamen of a New

Jersey RICO violation, frequently referred to as 'racketeering,' is the involvement in the affairs

of an enterprise through a pattern of racketeering activity."  Id. at 155.  Thus, a party alleging

such a RICO violation must demonstrate both the existence of (1) an enterprise, and (2) a pattern

of racketeering activity.  Id. at 161-62.

The New Jersey RICO statute defines the term "enterprise" in fairly broadly.  See Ball,

141 N.J. at 161.  It includes "any individual, sole proprietorship, partnership, corporation,

business or charitable trust, association, or other legal entity, any union or group of individuals

associated in fact although not a legal entity, [] include[ing] illicit as well as licit enterprises and

governmental as well as other entities."  N.J.S.A. 2C:41-1c.  Thus, as a corporation, Lifebank

meets the definition of an enterprise under the statute.

The Court need not determine whether Dr. Hariri engaged in a pattern of racketeering

activity through Lifebank because the record provides no evidence of racketeering activity in the

first place.  The New Jersey RICO statute lists a host of crimes that constitute racketeering

activity.  See N.J.S.A. 2C:41-1a.  Here, Mr. Leibholz alleges a scheme where (1) Dr. Hariri

induced Lifebank employees and consultants to perform services for him and the company in

exchange for equity that was never transferred, and (2) Dr. Hariri engaged in a fraudulent

valuation of equipment that he contributed to Lifebank in order to increase his equity in the company.  Thus, the crime applicable to Mr. Leibholz's allegations that amounts to racketeering activity under the statute is "fraud in the offering, sale or purchase of securities."  N.J.S.A. 2C:41-1a(p).

However, the record provides no support for these allegations.  In his motion papers, Mr. Leibholz contends that Dr. Hariri committed related acts of fraud against him, Loulla Moshen, Donald Wernsing, and Laurence Stein through "(1) a promise of Lifebank stock in exchange for services, (2) withholding the promised stock during employment or taking it away afterwards, (3) creating a 'condition' that was supposedly unmet after employment ceased, thereby nullifying the original promise, and (4) rejecting the requested issuance of the shares in question."  (Pl.'s Br. Summ. J. 25.)  As discussed in Point IIC, no reasonable juror could find that Dr. Hariri or Lifebank perpetrated a fraud against Mr. Leibholz.  Similarly, no reasonable juror could find that Dr. Hariri committed fraud against Ms. Moshen.[14]  See (Pl.'s Br. Opp. Summ. J., Ex. Q.)  In addition, the record fails to support for Mr. Leibholz's allegations of fraud perpetrated by Dr. Hariri against Mr. Wernsing.  It merely demonstrates that Mr. Wernsing brought breach of contract claims against Anthrogenisis and Celgene, which were ultimately resolved through mediation.  See (Supplemental Certification of Robert Solomon in Further Support of Motion for Summary Judgment, dated November 5, 2010 ("Solomon Supp. Cert. Supp."), Ex. R.)  Moreover, he testified that he was never aware of any representations made to

_____

[14] Ms. Moshen testified that Dr. Hariri, at times, told her that in exchange for her hard work at Lifebank, he would "take care" of her and "make [her] a rich girl."  (Pl.'s Br. Opp. Summ. J., Ex. Q.)  She further testified that at an employee dinner Dr. Hariri said to her and the other attendees that "[i]f we get to go public you will get three percent of the stock options." (Id.)  This cannot serve as a basis on which to find a misrepresentation of existing or past fact. See Manasquan River Reg. Sewerage, 117 N.J. at 248.  Moreover, she testified that she does not even feel entitled to bring a claim against Dr. Hariri.  See (Pl.'s Br. Opp. Summ. J., Ex. Q.)

him by Dr. Hariri or anyone else at the company that were fraudulent or untruthful.   See (Solomon Cert. Supp., Ex. T.)

     With respect to Mr. Stein, the Superior Court of New Jersey, Somerset County granted summary judgment against all of his fraud claims against Dr. Hariri and Lifebank, finding them to be "a recasting of a run-of-the-mill failure to perform contractual obligations for which Stein has contractual remedies."  (Solomon Supp. Cert. Supp., Ex. A, N.)  Mr. Leibholz, whose allegations of Dr. Hariri's fraud against Mr. Stein are based solely on those in the Stein Lawsuit, gives the Court no reason to find otherwise in this lawsuit.

     Finally, Mr. Leibholz's allegations regarding Dr. Hariri's scheme "to transfer more than 10% of Lifebank's outstanding equity from [] other shareholders" to himself through a fraudulent valuation of laboratory equipment that he contributed to Lifebank, (Pl.'s Br. Opp. Summ. J. 18), are also wholly engrafted from those in the Stein Lawsuit and find no support in the record of this case.  In fact, the court in the Stein Lawsuit upheld the valuation of the equipment, which was corroborated by an independent appraisal, and found no evidence of fraud or bad faith.  (Solomon Supp. Cert. Supp., Ex. N.)  Therefore, Mr. Leibholz's New Jersey RICO claim is dismissed.

### III.  CONCLUSION

     For the foregoing reasons, Dr. Hariri's Motion for Summary Judgment is GRANTED, while Mr. Leibholz's Motion for Summary Judgment is GRANTED with respect to Dr. Hariri's counterclaims for misappropriation and false light, but DENIED with respect to Mr. Leibholz's claims for breach of contract.  Mr. Leibholz's and Dr. Hariri's claims are dismissed in their entirety.

     The Court will enter an order implementing this opinion.

   **/s/Dickinson R. Debevoise**_____
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: April 15, 2011